UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY S. FRUCIANO, <br><br> Plaintiff, <br><br> v. <br><br> TOM LUE, M.D., et al., <br><br> Defendants. | Case No.18-cv-04452-JSC <br><br> **ORDER RE: DEFENDANTS' MOTIONS TO DISMISS SECOND AMENDED COMPLAINT AND MOTION TO STRIKE** <br><br> Re: Dkt. Nos. 49, 50, 51, 52 |

Plaintiff Anthony Fruciano representing himself alleges discrimination under the Unruh Act and 42 U.S.C. § 1983 in connection with medical treatment he sought from numerous health care providers in 2016. Defendants have separately moved to dismiss his Second Amended Complaint and Defendant Lue has moved to strike under Federal Rule of Civil Procedure 12(f).[1] (Dkt. Nos. 49, 50, 51, 52.) Having considered the parties' briefs and having had the benefit of oral argument on April 4, 2019, the Court GRANTS the motions to dismiss Plaintiff's Unruh Act claims against each of the moving defendants as barred by the statute of limitations and/or for failure to state a claim. Defendant Lue's motion to strike is DENIED because it seeks relief beyond the scope of Rule 12(f).

//

//

---

[1] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 9, 18, 20, 22, 30, 97.)

**BACKGROUND**

**A.      Second Amended Complaint Allegations**

Plaintiff is a 53-year old man who has a congenital swallowing disorder and a history of panic attacks. (Dkt. No. 45 (Second Amended Complaint ("SAC") at ¶¶ 17-19.[2]) In 2016, Plaintiff had three separate medical encounters which form the basis of this action.

*First*, in April 2016, Plaintiff was referred to Dr. Lue, an urologist who specialized in penile abnormalities, for a consultation regarding his curved penis. (*Id*. at ¶ 29.) Plaintiff arrived for his appointment with Dr. Lue at the University of California Urology Clinic on May 22, 2016 and was surprised that both Dr. Lue, and his fellow, Dr. Reed-Maldonado, entered his exam room.[3] (*Id*. at ¶ 32.) Dr. Reed-Maldonado then escorted Plaintiff to another room for a duplex Doppler ultrasound (DDUS). (*Id*. at ¶ 32.) Dr. Reed-Maldonado directed Plaintiff to "drop his pants" and injected his penis with 0.1 ml of bitmax: papaverine, 30 mg/mL; phentolamine, 0.5 mg/mL to induce an erection. (*Id*. at ¶ 34.) Dr. Reed-Maldonado then exited the room and advised Plaintiff to "stimulate himself," but he was unsuccessful in doing so. (*Id*.) When Dr. Reed-Maldonado returned to the room she "grabbed the plaintiff's penis and roughly jerked it up and down, up and down...and said 'Come on, wake up. Get up. Man up.'" (*Id*. at ¶ 88.) Dr. Lue eventually returned to the room and moved the ultrasound transducer "along the surface of plaintiff's still flaccid penis." (*Id*. at ¶ 36.) Dr. Lue then compared Plaintiff unfavorably to a younger patient he had seen earlier that day whose "erection pointed to the ceiling." (*Id*. at ¶ 37.) Plaintiff suggested that Dr. Lue give him a second injection, but Dr. Lue refused saying it "would be a waste of time, because [Plaintiff was] too anxious." (*Id*. at ¶ 38 (alterations in original).) Plaintiff offered Dr. Lue a photo he had taken of his erect penis, but Dr. Lue never looked at it. (*Id*. at ¶ 40.) Instead, Dr. Lue wrote Plaintiff a prescription for nightly Levitra. (*Id*. at ¶ 41.)

The next day, Plaintiff discovered that Dr. Reed-Maldonado had access to Dr. Lue's email. (*Id*. at ¶ 45.) A month later, when Plaintiff requested a follow-up appointment, he asked that Dr.

---

[2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.
[3] Although Plaintiff refers to Dr. Reed-Maldonado as Dr. Reed, the Court uses her full name throughout.

2

Reed-Maldonado not be involved because "he felt more uncomfortable and anxious with a woman in the room." (*Id*. at ¶ 91.) In response, Plaintiff received a letter in the mail which terminated the doctor-patient relationship and barred Plaintiff from seeing any physician at the University of California Faculty Urology Practice. (*Id*. at ¶ 45.) Although the letter was signed by Dr. Lue, Plaintiff believes Dr. Reed-Maldonado wrote the letter. (*Id*.) Plaintiff telephoned the University of California's patient liaison office to complain and was told that two administrators would review the situation, but they "found nothing amiss." (*Id*. at ¶ 48.)

*Second*, on May 30, 2016, Plaintiff had an appointment with Dr. Eisenberg at Stanford Health's Urology Clinic. (*Id*. at ¶¶ 58, 60.) Dr. Eisenberg arrived late for the appointment and appeared "[un]enthused." (*Id*. at ¶ 60.) He asked Plaintiff what his goal was and Plaintiff replied "that he wanted the ability to engage in sexual intercourse in a basic woman on top position safely and successfully." (*Id*. at ¶ 61.) Dr. Eisenberg responded "But, you're alone; besides, there are plenty of other positions, and your unusual anatomy could open up creative possibilities." (*Id*.) Dr. Eisenberg then "quickly palpat[ed] the plaintiff's flaccid penis" which "triggered the start of an erection" and "look[ed] at the plaintiff's one and only photo of his erect penis," but "did not do much more." (*Id*. at ¶ 62.) Dr. Eisenberg did not perform a DDUS and instead prescribed nightly Levitra. (*Id*. at ¶¶ 62-63.) Plaintiff did not take the Levitra, but shortly thereafter, sent Dr. Eisenberg a link to two YouTube videos posted by a urologist in New York City which recommended diagnostic testing for men having erectile problems. (*Id*. at ¶ 64.) Dr. Eisenberg responded that Plaintiff should go and see that doctor which Plaintiff found "shocking" and "despicable" because he suffers panic attacks and is afraid of flying. (*Id*. at ¶ 65.) Plaintiff told Dr. Eisenberg his response "was rude" and shortly thereafter Dr. Eisenberg wrote to Plaintiff terminating their relationship because Plaintiff did not trust him. (*Id*. at ¶ 66.)

*Third*, on July 11, 2016, Plaintiff attended an appointment with Dr. Karpman of the Urological Surgeons of Northern California at El Camino Hospital. (*Id*. at ¶ 71.) Plaintiff was escorted to a diagnostic testing area by a DDUS technician. (*Id*. at ¶ 73.) "The first thing she did was move the transducer along the surface of the plaintiff's flaccid penis" and then she went to retrieve Dr. Karpman. (*Id*.) Dr. Karpman returned alone, injected Plaintiff's penis, and "made

3

one of the universally recognized vulgar gestures indicating that he wanted the plaintiff to masturbate." (*Id*. at ¶ 74.) The injection he received was "somewhat more substantial" than the injection Dr. Reed-Maldonado gave him and "soon produced an erection." (*Id*. at ¶ 75.) Dr. Karpman then returned to the room with the technician and "she had barely started to move the transducer along the surface of the plaintiff's erect penis, when defendant Dr. Karpman said, 'He has a leak.'" (*Id*. at ¶ 76.) Dr. Karpman then "touched the glans [sic] of the plaintiff's erect penis for a few seconds," but this was the only time he physically examined Plaintiff's genitals. (*Id*.) The DDUS was completed in a couple of minutes, although "[s]tandard protocol requires checking blood flows every five minutes for several intervals." (*Id*.) The "leak" might have been "temporary; it might have been due to the single, relatively small injection not having been potent enough to counteract fully the plaintiff's anxiety," but it cannot be known since Dr. Karpman did not follow standard protocol. (*Id*.) Likewise, Dr. Karpman failed to identify any "scarring/plaque" or the "long fibrotic strip on Buck's Facia" during the "few seconds he looked at the computer screen's imagery." (*Id*.)

After the DDUS, Plaintiff and Dr. Karpman spoke in his office. (*Id*. at ¶ 77.) Dr. Karpman began by mentioning that he had worked with Dr. Reed-Maldonado before and then went on to discuss Plaintiff's situation. "[P]laintiff's meager experience with partnered sex and the plaintiff's swallowing disorder appeared to annoy and frustrate Dr. Karpman." (*Id*.) He said "It's not like I could send you out there to play the field and see how your penis would fare with screwing in woman on top positions." (*Id*.) "The plaintiff could not avoid getting the impression that defendant Dr. Karpman was unenthused by applying his skills to a penis which likely would be seen and used by the plaintiff only." (*Id*.) They discussed various treatment options and Dr. Karpman was "very partial to an implant with or without grafting." (*Id*. at ¶ 78.) Plaintiff was less sure and at the conclusion of the visit Dr. Karpman said "Let me know what you decide to do." (*Id*. at ¶¶ 78-79.) Plaintiff did a lot of thinking and then sent Dr. Karpman 12 follow-up questions with some corrections to his paperwork. (*Id*. at ¶ 79.) Plaintiff did not hear from Dr. Karpman for a week and then he discovered two voicemail messages from Dr. Karpman. (*Id*. at ¶ 80.) When he returned Dr. Karpman's call, Dr. Karpman launched into a "diatribe" and

4

terminated their relationship. (*Id.* at ¶¶ 80-81.) He "berated" Plaintiff for asking questions and called Plaintiff "paranoid" for correcting his paperwork. (*Id.* at ¶ 81.) He also "bemoaned that 'people on disability like [the plaintiff] burden the health care system at no cost to [yourself] by going to doctor after doctor to get test after test.'" (*Id.* (alterations in original).) Dr. Karpman then referred to Dr. Lue and said "they just wanted to pat you on the head and get rid of a useless guy like you." (*Id.*) Dr. Karpman concluded by saying "[n]one of us wants you as a patient and good luck finding someone who does." (*Id.*)

Plaintiff thereafter attempted to make an appointment with Dr. Shahram Gholami, who unbeknownst to Plaintiff was also a member of Urological Surgeons of Northern California, but Dr. Gholami cancelled the appointment because Dr. Karpman had labeled Plaintiff as "problematic." (*Id.* at ¶ 82.)

In July 2017, Dr. Ira Sharlip performed a botched graft surgery which is not the subject of this action. (*Id.* at ¶ 22.)

### B. Procedural Background

Plaintiff filed this civil action in the Alameda County Superior Court on May 22, 2018 against the Regents, Dr. Lue, Dr. Reed-Maldonado, Stanford Health Care, Dr. Eisenberg, El Camino Hospital, Urological Surgeons of Northern California, Dr. Karpman, and Does 1-25. (Dkt. No. 1 at 8.) Plaintiff pled three claims for relief under the Unruh Act, Cal. Civ. Code § 51, against all of the defendants, and a claim for sexual harassment under Cal. Civ. Code § 51.9 against the Regents, Dr. Lue, and Dr. Reed-Maldonado. Just over two weeks later, Plaintiff filed his First Amended Complaint changing his sexual harassment claim to a claim under 42 U.S.C. § 1983 against the Regents, Dr. Lue, and Dr. Reed-Maldonado. (*Id.* at 42.)

The Regents removed the action to federal court based on federal question jurisdiction. (Dkt. No. 1.) The other defendants thereafter joined in removal. (Dkt. Nos. 8, 14, 17 & 26.) Plaintiff then moved for remand contending the removals were untimely. (Dkt. No. 5 & 12.) The Regents and Drs. Lue and Reed-Maldonado opposed the motions to remand, and moved to dismiss the complaint for failure to state a claim. (Dkt. Nos. 10, 19, 29.) Stanford Health Care and Dr. Eisenberg answered the complaint as did Urological Surgeons of Northern California and

Dr. Karpman. (Dkt. Nos. 16 & 17.) The Court thereafter denied the motion to remand and granted in part and denied in part the motion to dismiss. (Dkt. No. 34.)

Plaintiff then filed the now operative Second Amended Complaint which pleads Unruh Act discrimination claims against (1) Dr. Lue and Dr. Reed-Maldonado (First Claim); (2) Stanford Health and Dr. Eisenberg (Second Claim); (3) Urological Surgeons of Northern California and Dr. Karpman (Third Claim); and a Section 1983 Claim against Drs. Lue and Reed-Maldonado (Fourth Claim). (Dkt. No. 45.) Each of the defendants separately moved to dismiss and Defendants Lue and Reed-Maldonado also filed a motion to strike under Federal Rule of Civil Procedure 12(f). (Dkt. Nos. 49, 50, 51, 52.)

All of the motions were set for hearing on December 6, 2018. However, Plaintiff advised the Court shortly before the hearing that he was ill and unable to attend. In addition, the United States specially appeared on behalf of Defendant Dr. Reed-Maldonado and indicated she had tendered her defense of the action to the government. (Dkt. No. 65-1.) The Court, therefore, continued the hearing on the pending motions to January 31, 2019. Dr. Reed-Maldonado thereafter notified the Court that the United States intended to file a motion to substitute and dismiss for lack of subject matter jurisdiction. (Dkt. Nos. 66, 67.) The Court set a briefing schedule for that motion and rescheduled the hearing on the previously filed motions to dismiss to be heard concurrently. (Dkt. Nos. 68, 76, 95.)

The government has since moved to substitute itself for Dr. Reed-Maldonado and to dismiss the claims previously pled as to her. (Dkt. No. 69.) The claims against Dr. Reed-Maldonado are thus addressed by separate order. Further, Plaintiff filed a stipulation dismissing his claims against Dr. Eisenberg and Stanford Health Care with prejudice. (Dkt. No. 71.) This Order thus does not address the now moot motion to dismiss filed by Dr. Eisenberg and Stanford Health Care.

**DISCUSSION**

**I. Motions to Dismiss**

Plaintiff's first, second, and third claims for relief all arise under the Unruh Act. The Unruh Act, Section 51 provides in relevant part, "All persons within the jurisdiction of this state

are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, or medical condition are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b). "Its purpose is to compel recognition of the equality of all persons in the right to the particular service offered by an organization or entity covered by the act." *Stamps v. Superior Court*, 136 Cal. App. 4th 1441, 1448 (2006) (internal citation and quotation marks omitted). Each of the defendants separately move to dismiss Plaintiff's Unruh Act Claim as to them on the ground that it is barred by the one-year statute of limitations for medical malpractice claims and otherwise fails to state a claim.

The Medical Injury Compensation Reform Act (MICRA) provides a one-year from discovery or three-years from injury, whichever occurs first, statute of limitations for claims against a health care provider alleging professional negligence. Cal. Code Civ. P. § 340.5. Plaintiff's characterization of his claims against the defendant health care providers as Unruh Act discrimination claims does not mean that the MICRA time limitation does not apply. "[W]hen a cause of action is asserted against a health care provider on a legal theory other than medical malpractice, the courts must determine whether it is nevertheless based on the 'professional negligence' of the health care provider so as to trigger MICRA." *Smith v. Ben Bennett, Inc.*, 133 Cal. App. 4th 1507, 1514 (2005). To make this determination, the court must "examin[e] the legal theory underlying the particular claim and the nature of the conduct challenged to determine whether, under California law, it would constitute 'professional negligence' subject to Civil Code section [340.5]." *Barris v. Cty. of Los Angeles*, 20 Cal. 4th 101, 116 (1999).

The Court thus must examine Plaintiff's allegations to determine whether drawing all reasonable inferences in Plaintiff's favor they lie in medical malpractice—as Defendants insist— or discrimination—as Plaintiff insists. The parties agree that if the MICRA one-year limitation does not apply, Plaintiff's Unruh Act claims are timely.

**A. Dr. Lue**

Plaintiff's Unruh Act claim against Dr. Lue arises from his May 22, 2016 appointment and a letter he received from Dr. Lue thereafter terminating the relationship and advising Plaintiff that he was barred from seeing any physician in the Urology Practice. (Dkt. No. 45 at ¶¶ 28-51.) The

7

Court previously dismissed the claim as barred by the medical malpractice statute of limitations because while Plaintiff had alleged that Drs. Lue and Reed-Maldonado were insensitive and even rude, and that they provided inadequate treatment for his medical condition, his allegations did not plausibly suggest that this was because of Plaintiff's anxiety or swallowing disorder or his asexual sexual orientation. (Dkt. No. 34.)

In his Second Amended Complaint, Plaintiff added very little to his allegations regarding what happened during his May 22 visit, and instead, realleges that the following treatment was improper: failing to follow standard protocol for administering the Doppler ultrasound (*id*. at ¶ 34); being told to stimulate himself without being given the opportunity to wash his hands (*id*. at ¶¶ 34-35); being given an "unacceptably weak" injection (*id*. at ¶¶ 34, 38); Dr. Lue unfavorably comparing Plaintiff to another patient who had the same procedure and achieved an "erection [that] pointed to the ceiling" (*id*. at ¶ 37); Dr. Lue refusing to give Plaintiff a second injection to achieve an erection because "it would be a waste of time, because [the plaintiff was] too anxious" (*id*. at ¶ 38 (alterations in original)); Dr. Lue's failure to examine Plaintiff's penis "[b]ecause the injection had not induced an erection" (*id*. at ¶ 40); Dr. Lue refusing to look at a photograph of Plaintiff's erect penis (*id*.); Dr. Lue writing Plaintiff a refillable prescription for nightly Levitra although a "pill, be it Levitra or any other, has never straightened anyone's penis" (*id*. at ¶ 41); and Dr. Lue's letter terminating the doctor-patient relationship and barring Plaintiff from seeing any physician in the Urology Practice (*id*. at ¶ 45).

### 1) Plaintiff's Unruh Act Claim as a Medical Malpractice Claim

Plaintiff's complaint that Dr. Lue treated him poorly and incompetently is a claim for professional negligence within the meaning of California Code of Civil Procedure 340.5 as a matter of law. *See Unruh–Haxton v. Regents of University of California*, 162 Cal.App.4th 343, 353 (2008). MICRA defines "professional negligence" as "a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital." Cal. Code Civ. P. § 340.5; *see also* Cal. Civ. Code § 3333.2 (providing same definition of "professional negligence" for MICRA limitation

on non-economic damages). In deciding whether a claim is "based upon professional negligence," and thus falls within MICRA, the court examines the complaint "allegations that identify the nature and cause of a plaintiff's injury . . . to determine whether each is directly related to the manner in which professional services were provided." *Cent. Pathology Serv. Med. Clinic, Inc. v. Superior Court*, 3 Cal. 4th 181, 192 (1992). In *Cent. Pathology Serv. Med. Clinic, Inc.*, for example, the plaintiff's fraud cause of action was subject to MICRA because it "emanate[d] from the manner in which defendants performed and communicated the results of medical tests, [which was] a matter that is an ordinary and usual part of medical professional services." *Id*. at 193. Plaintiff's allegations as to Dr. Lue emanate from the manner in which he treated Plaintiff during his appointments, the course of treatment prescribed, and the decision to terminate the doctor-patient relationship, all of which involve the "ordinary and usual [provision] of medical professional services" and thus all fall within the section 340.5's definition of medical professional negligence.

The cases upon which Plaintiff relies are all inapposite. First, Plaintiff relies on *Perry v. Shaw*, 88 Cal. App. 4th 658 (2001), for the proposition that a medical provider's conduct can amount to both professional negligence and an intentional tort. However, in *Perry*, the court explicitly cautioned against any broader reading of its holding noting that "our holding is limited to the type of battery that occurred in this case." *Perry v. Shaw*, 88 Cal. App. 4th 658, 668 n.4 (2001). The battery in that case was performing a surgery to which the patient did not consent—not at all similar to the facts alleged here. Likewise, while the court in *Smith v. Ben Bennett, Inc.*, 133 Cal. App. 4th 1507, 1515 (2005), held that MICRA's statute of limitations does not apply to an elder abuse claim, Plaintiff has not pled an elder abuse claim. Finally, Plaintiff insists that under *Unruh-Haxton v. Regents of Univ. of California*, 162 Cal. App. 4th 343 (2008), as modified (May 15, 2008), MICRA's statute of limitations should not apply to certain intentional tort claims against health care providers. However, the *Unruh Haxton* court reiterated that the test is whether "a cause of action [] asserted against a health care provider on a legal theory other than medical malpractice…is nevertheless based on the 'professional negligence' of the health care provider so as to trigger MICRA." *Id*. at 353. Because the patients' tort claims there did not arise out of allegations that the physicians' conduct fell below the standard of care—in contrast to Plaintiff's

9

allegations here—those claims were not subject to MICRA's statute of limitations.

Thus, Plaintiff's Unruh Act claim predicated on allegations of medical malpractice by Dr. Lue is subject to MICRA. Because there is no dispute that the claim was not filed within one-year of discovery, it is barred by MICRA's one-year statute of limitations. *See* Cal. Code Civ. P. § 340.5.

### 2) Plaintiff's Unruh Act Claim as a Discrimination Claim

Nor has Plaintiff pled a plausible Unruh Act claim against Dr. Lue separate from his medical malpractice claim. To succeed on a discrimination Unruh Act claim a plaintiff must prove intentional discrimination by a business establishment (apart from an exception not relevant to this lawsuit). *See Cohn v. Corinthian Colleges, Inc.*, 169 Cal. App. 4th 523, 528 (2008) ("The Unruh Act requires intentional discrimination to protect against "all unreasonable, arbitrary, or invidious discrimination."). In particular, the Unruh Act requires allegations of a defendant's "willful, affirmative misconduct." *Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 425 (9th Cir. 2014) (quoting *Koebke v. Bernardo Heights Country Club*, 36 Cal.4th 824, 853 (2005)).

Plaintiff does not allege that Dr. Lue engaged in any such willful, affirmative discriminatory misconduct. Instead, he essentially argues that given the amount or quality of the poor treatment, Defendants' conduct must go "beyond professional negligence." (Dkt. No. 57 at 10.) For example, he contends that because every urologist—even "[a] urologist who graduated last in his or her class and whose office is in a strip mall knows that neither Levitra nor any other pill has ever straightened a penis," Dr. Lue must have engaged in intentional discrimination. (*Id.*) His allegation, however, is classic medical professional negligence—not prescribing the correct medication—and not discrimination based on disability.

Plaintiff's reliance on Dr. Lue's refusal to administer another injection because Dr. Lue believed Plaintiff was "too anxious" is also misplaced. Again, Plaintiff is challenging the manner of Dr. Lue's provision of professional medical services. Dr. Lue stating that Plaintiff was "too anxious" for a second injection to work no more makes his claim a discrimination claim than would an allegation that a doctor refused to perform surgery on a patient because the patient was "too sick." Plaintiff's requested inference that Dr. Lue refused the second injection because of

10

disability discrimination as opposed to a medical judgment (however sound or unsound) is implausible. *See Starr v. Baca*, 652 F.3d 1202, 1217 (9th Cir. 2011). While Plaintiff plausibly pleads a claim against Dr. Lue for professional negligence, he has not plausibly pled a claim of intentional discrimination.

\*\*\*

Accordingly, Plaintiff's Unruh Act claim against Dr. Lue is barred by the MICRA statute of limitations to the extent that it is predicated on a claim of medical malpractice. To the extent that Plaintiff separately pleads an Unruh Act claim based on intentional discrimination, Plaintiff has not plausibly alleged that he was discriminated against based on his membership in a protected group, as opposed to afforded shoddy medical care which does not give rise to an actionable claim for discrimination under the Unruh Act.

The Court previously dismissed Plaintiff's Unruh Act claim with leave to amend. As Plaintiff's amended complaint added very little, and nothing of substance to his allegations against Dr. Lue, and he concedes that he cannot plead additional allegations which would take his Unruh Act claims outside MICRA or state an intentional discrimination claim (Dkt. No. 57 at 17), his Unruh Act claims against Dr. Lue are dismissed without leave to amend as further leave to amend would be futile.

### B. Dr. Karpman and Urological Surgeons of Northern California

Plaintiff's Unruh Act claim against Dr. Karpman and Urological Surgeons of Northern California is based on Plaintiff's July 11, 2016 visit with Dr. Karpman and a subsequent phone call with Dr. Karpman wherein Dr. Karpman terminated their relationship.[4] (*Id.* at ¶¶ 70-85.) Plaintiff alleges that Dr. Karpman's treatment was not in accordance with standard protocols; in particular, he complains that he was given an injection that was "hardly the potent one he had been led to suspect" (*id.* at ¶ 75); almost as soon as the DDUS began, Dr. Karpman stated that Plaintiff had a leak, but he failed to perform a full exam of Plaintiff's genitals, give him a second injection, or perform a DDUS in keeping with "standard protocols," and among other things failed to note

---

[4] Neither Dr. Karpman nor Urological Surgeons of Northern California moved to dismiss Plaintiff's original complaint so this is the first time the Court has considered Plaintiff's Unruh Act claim as to them.

11

Plaintiff's fibrotic strip (*id.* at ¶ 76). During his meeting with Dr. Karpman following the exam, Dr. Karpman gave the impression that he "was unenthused by applying his skills to a penis which likely would be seen and used by the Plaintiff only." (*Id.* at ¶ 77.) Then, after Plaintiff sent Dr. Karpman 12 follow-up questions and corrected paperwork, Dr. Karpman called Plaintiff and launched into a "diatribe" terminating their relationship calling Plaintiff "paranoid" and "berat[ing]" him for having asked follow-up questions. (*Id.* at ¶¶ 80-81.) Dr. Karpman described Plaintiff as a "useless guy" and a person on disability who was a burden on the health care system. (*Id.*) Dr. Karpman then labeled Plaintiff as "problematic" so he was unable book an appointment with another urologist in the Urological Surgeons of Northern California practice. (*Id.* at ¶ 82.)

### 1) Plaintiff's Unruh Act Claim as a Medical Malpractice Claim

Plaintiff's lament about the medical services Dr. Karpman provided him is a professional negligence claim and therefore barred by MICRA's one-year statute of limitations. *See* Cal. Code Civ. P. § 340.5. Just as with his allegations against Dr. Lue, Plaintiff's allegations as to Dr. Karpman emanate from the manner in which he treated Plaintiff during his appointment, the course of treatment prescribed, and the decision to terminate the doctor-patient relationship, all of which involve the "ordinary and usual [provision] of medical professional services" and thus all fall within the section 340.5's definition of medical professional negligence. *Cent. Pathology Serv.*, 3 Cal. 4th at 192. That Plaintiff believes that Dr. Karpman showed a lack of enthusiasm for treating Plaintiff does not take his allegations outside of MICRA.

### 2) Plaintiff's Unruh Act Claim as a Discrimination Claim

Nor has Plaintiff pled a plausible discrimination claim based on his disability (congenital swallowing disorder and/or anxiety and panic attacks) or sexual orientation. (Dkt. No. 45 ¶ 83.) Drawing all reasonable inferences in Plaintiff's favor, Plaintiff's allegations do not amount to "affirmative willful misconduct" of disability or sexual orientation discrimination. *Greater Los Angeles Agency on Deafness, Inc.*, 742 F.3d at 425. There are no allegations which plausibly suggest that Dr. Karpman failed to, for example, give Plaintiff a second injection, or refused to continue to treat Plaintiff, because of Plaintiff's anxiety or swallowing disorder or his asexual sexual orientation. *See Starr*, 652 F.3d at 1216 ("[A]llegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of

underlying facts to give fair notice and to enable the opposing party to defend itself effectively.")

At oral argument, Plaintiff argued that Dr. Karpman's comment about people on disability demonstrated an animus towards people with disability sufficient to show intentional discrimination based on his disability. However, as the Court noted at the hearing, at most Dr. Karpman's comment may reflect a bias against people receiving disability benefits; but Plaintiff is not claiming that he was discriminated against based on the fact that he is on disability—in fact Plaintiff argues that he is not. The comment does not support a plausible inference that Dr. Karpman terminated the patient-doctor relationship or intentionally gave Plaintiff substandard care because of Plaintiff's anxiety or swallowing disorder or asexual orientation. *See Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009); *see also Freeman v. United States*, No. 13-CV-02421-WHO, 2014 WL 1117619, at *8 (N.D. Cal. Mar. 19, 2014) (holding on a motion to dismiss that allegations, among others, that a nurse was cruel failed "to show that racial discrimination motivated the actions of the head nurse or other defendants"). Plaintiff thus does not plausibly allege an Unruh Act discrimination claim against Dr. Karpman.

\*\*\*

Accordingly, while Plaintiff may have pled a plausible Unruh Act claim against Dr. Karpman and Urological Surgeons of Northern California based on medical malpractice, any such claim is barred by the one-year statute of limitations, and Plaintiff has not pled a plausible claim for intentional discrimination under the Unruh Act. Plaintiff will, however, be granted leave to amend his Unruh Act claim against Dr. Karpman and Urological Surgeons of Northern California because he has not had an opportunity to amend this claim before.

**II. Motion to Strike**

Under Federal Rules of Civil Procedure 12(f) "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. Rule Civ. Proc. 12(f). Defendant Lue moves to strike Plaintiff's request for exemplary damages in connection with his Section 1983 claim and to strike Plaintiff's request for attorney fees on the grounds that the claim is subject to the Federal Tort Claims Act (FTCA) and thus subject the restriction on available damages in the FTCA and California Code of Civil Procedure section 425.13. Dr. Lue, however, cites no authority to support that argument and the Court is unaware of

13

any. In any event, "Rule 12(f) of the Federal Rules of Civil Procedure does not authorize a district court to strike a claim for damages on the ground that such damages are precluded as a matter of law." *Whittlestone, Inc. v. Handi–Craft Co.*, 618 F.3d 970, 971 (9th Cir. 2010); *First Nat. Ins. Co. of Am. v. Peralta Cmty. Coll. Dist.*, No. 12-CV-5943 JSC, 2013 WL 622944, at *8 (N.D. Cal. Feb. 15, 2013); *see also Perez v. Leprino Foods Co.*, 2018 WL 1426561, at *2 (E.D. Cal. Mar. 22, 2018) ("District courts in this Circuit have extended *Whittlestone* to include the general proposition that no a prayer for injunctive relief (and any prayer for relief, generally) is appropriately stricken pursuant to Rule 12(f)" and collecting cases re: the same). The Court notes, however, that a plaintiff representing himself cannot recover attorneys' fees. *See Kay v. Ehrler*, 499 U.S. 432, 435 (1991) ("[A] pro se litigant who is not a lawyer is not entitled to attorney's fees."); *Elwood v. Drescher*, 456 F.3d 943, 947 (9th Cir. 2006) ("[T]he *Kay* opinion ... appears to deny attorneys' fees generally to all pro se litigants, including pro se litigants who are attorneys.").

## CONCLUSION

For the reasons stated above, Defendants' motions to dismiss are GRANTED. Plaintiff's Unruh Act claim against Dr. Lue is dismissed without leave to amend. Plaintiff' Unruh Act claim against Dr. Karpman and Urological Surgeons of Northern California is dismissed with leave to amend. Defendant Lue's motion to strike is DENIED.

Plaintiff shall file any amended complaint with respect to his Unruh Act claim against Dr. Karpman and Urological Surgeons of Northern California within 20 days of this Order.

Defendant Lue's answer to the second amended complaint is due in 21 days.

The Court sets an Initial Case Management Conference for June 20, 2019 at 1:30 p.m, 450 Golden Gate Ave., San Francisco, California. The Joint Case Management Conference Statement is due the week before.

This Order disposes of Docket Nos. 49, 50, 51, and 52.

**IT IS SO ORDERED.**

Dated: April 24, 2019

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge

14